p. 1

CHARLES H. JUNG (SBN 217909)
NASSIRI & JUNG LLP
251 Kearny Street, Suite 501
San Francisco, California 94108
Telephone: (415) 373-5699
Facsimile:  (415) 534-3200
cjung@nassiri-jung.com

Attorneys for Defendant
NAVAGILITY, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOM AZZARELLO,<br><br>                          Plaintiff,<br><br>        v.<br><br>NAVAGILITY LLC,<br><br>                          Defendant. | Case No. 08-CV-2371 MEJ<br><br>**SUPPLEMENTAL DECLARATION OF ANTHONY M. DIMARCO IN SUPPORT OF NAVAGILITY, LLC'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE PURSUANT TO F.R.C.P. 12(B)(2) AND 12 (B)(3)** |

Anthony M. DiMarco, on oath, deposes and states as follows:

1.      This supplemental declaration is made in support of NavAgility, LLC's ("NavAgility") Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue Pursuant to Fed. R. Civ. P. 12(b)(2) and (3).  This declaration is based upon facts known personally by me or upon such business records of NavAgility as are admissible in evidence.  As to those averments made on information and belief, I believe them to be true.

P. 2

2.    Attached as a Exhibit A true and correct copy of the Operating Agreement signed by Tom Azzarello.

Signed this 26 day of June, 2008, under the pains and penalties of perjury:

_____
Anthony M. DiMarco

**EXHIBIT A**

**NavAgility LLC**
**Member-Managed**
**Limited Liability Company**
**Operating Agreement**

Explanatory Statement

Article I.  Defined Terms

Article II. Formation and Name: Office; Purpose; Term

2.1.  Organization
2.2.  Name of the Company
2.3.  Purpose
2.4.  Term
2.5.  Registered Agent
2.6.  Members

Article III. Members; Capital; Capital Accounts

3.1.  Initial Capital Contributions
3.2   No Additional Capital
      Contributions Required
3.3.  No Interest on Capital Contributions
3.4.  Return of Capital Contributions
3.5.  Form of Return of Capital
3.6.  Capital Accounts
3.7.  Loans

Article IV. Profit, Loss, and Distributions

4.1.  Distributions of Cash Flow
4.2.  Allocation of Profit or Loss
4.3.  Regulatory Allocations
4.4.  Liquidation and Dissolution
4.5.  General

Article V.  Management: Rights, Powers, and Duties

5.1.  Management
5.2.  Meetings of and Voting by Members
5.3.  Personal Service
5.4.  Duties of Parties
5.5.  Liability and Indemnification

Article VI. Transfer of Interests and Withdrawal of
            Members

6.1.  Transfers
6.2.  Voluntary Withdrawal
6.3.  Involuntary Withdrawal

Article VII. Dissolution, Liquidation, and Termination of the Company

7.1.  Events of Dissolution
7.2.  Procedure for Winding Up and
      Distribution
7.3.  Filing of Articles of Dissolution

Article VIII. Books, Records, Accounting, and Tax Elections

8.1.  Bank Accounts
8.2.  Books and Records

© 2005 NavAgility LLC.  All rights reserved.    NavAgility Confidential

```
                8.3.  Annual Accounting Period
                8.4.  Reports
                8.5.  Tax Matters Member

Article IX. General Provisions
                9.1.  Assurances
                9.2.  Notifications
                9.3.  Specific Performance
                9.4.  Complete Agreement
                9.5.  Applicable Law
                9.6.  Article and Section Titles
                9.7.  Binding Provisions
                9.8.  Exclusive Jurisdiction and Venue
                9.9   Dispute Resolution
                9.10. Terms
                9.11. Separability of Provisions
                9.12. Counterparts

Exhibit A.  List of Members, Capital, and Percentages

Attachment A. Term Sheet for John R. Galanti
```

**NavAgility LLC**
**Member-Managed**
**Limited Liability Company**
**Operating Agreement**

This Operating Agreement (the "Agreement") is entered into as of the 23rd day of February 2005, by and among Anthony M. DiMarco, a resident of the State of New York, with an address at 16 Nob Hill Road, Poughkeepsie, N.Y. 12603 and Richard C. Azzarello, a resident of the State of New York with an address at 299 8th Avenue, Sea Cliff, NY 11579 and David L. Hawthorne, a resident of the State of New York with an address at 200 Mercer Street, New York, NY 10012 and Thomas Azzarello, a resident of the State of California with an address at 2037 Olympic Boulevard, Walnut Creek, CA 94595 and John R. Galanti, a resident of the State of New York with an address at 100 Corbett Road, Montgomery, NY 12549(collectively, the "Members").

EXPLANATORY STATEMENT

The parties have agreed to organize and operate a limited liability company in accordance with the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the parties, intending legally to be bound, agree as follows:

Article I
Defined Terms

The following capitalized terms shall have the meaning specified in this Article I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) the deficit shall be decreased by the amounts which the Interest Holder is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii) the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

"Adjusted Capital Balance" means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections 4.1 and 4.4 hereof. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

"Affiliate" means, with respect to any Member, any Person: (i) which owns more than 50% of the voting interests in the Member; or (ii) in which the Member owns more than 50% of the voting interests; or (iii) in which more than 50% of the voting interests are owned by a Person who has a relationship with

© 2005 NavAgility LLC.  All rights reserved.     NavAgility Confidential

the Member described in clause (i) or (ii) above, or (iv) who otherwise controls, is controlled by, or under common control with, another Person.

"Agreement" means this Operating Agreement, as amended from time to time.

"Capital Account" means the account to be maintained by the Company for each Interest Holder in accordance with the following provisions:

(i) an Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's distributive share of Profit and any item in the nature of income or gain specially allocated to the Interest Holder pursuant to the provisions of Article IV (other than Section 4.3.3); and

(ii) an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the amount of any liabilities of the Interest Holder assumed by the Company (or which are secured by property contributed by the Interest Holder to the Company), the Interest Holder's distributive share of Loss and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Article IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"Cash Flow" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Members. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law or any corresponding provision.

"Company" means the limited liability company formed in accordance with this Agreement.

"Interest" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Member or an unadmitted assignee of a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(i) the Member makes an assignment for the benefit of creditors;

(ii) the Member files a voluntary petition of bankruptcy;

(iii) the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) the Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v) the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi) the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii) if the Member is an individual, the Member's death, incapacity, or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(ix) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x) if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi) if the Member is a corporation, the dissolution of the corporation or the revocation of its charter;

(xii) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company; or

(xiii) the Member is expelled (if permitted in the operating agreement).

"Law" means the New York Limited Liability Company Law, as amended from time to time.

© 2005 NavAgility LLC.  All rights reserved.    NavAgility Confidential

"Member" means each Person who has signed this Agreement and any Person who subsequently is admitted as a member of the Company.

"Membership Interest" means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company.

"Minimum Gain" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"Negative Capital Account" means a Capital Account with a balance of less than zero.

"Percentage" means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

"Person" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero.

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i) all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(ii) any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(iii) any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(iv) gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

(v) in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Transfer" means   when used as a noun   any sale, hypothecation, pledge, assignment, gift, bequest attachment, or other transfer, including transfers by operation of Law, and   when used as a verb   means to sell, hypothecate, pledge, assign, give, bequeath, or otherwise transfer.

"Voluntary Withdrawal" means a Member's disassociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

Article II
Formation and Name: Office; Purpose; Term

2.1. Organization.

2.1.1. The parties hereby organize a limited liability company pursuant to the Law and the provisions of this Agreement and, for that purpose, have caused Articles of Organization to be prepared, executed, and filed with the New York Department of State on January XX, 2005.

2.2. Name of the Company. The name of the Company shall be "NavAgility LLC". The Company may do business under that name and under any other name or names upon which the Members agree. If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file an assumed-name certificate as required by General Business Law $^\perp$ 130.

2.3. Purpose. The Company is organized solely to own, manage, develop and offer software and services in the United States and outside the United States and to do any and all things necessary, convenient, or incidental to that purpose.

2.4. Term. The term of the Company shall begin upon the filing of Articles of Organization with the New York Department of State and shall have a perpetual existence unless its existence is sooner terminated pursuant to Article VII of this Agreement.

2.5. Registered Agent. The name and address in New York of the Company's registered agent upon whom and at which process against the Company can be served is Anthony M. DiMarco.

2.6. Members. The name, present mailing address, taxpayer identification number, agreed value of contribution and Percentage of each Member are set forth on Exhibit A.

Article III
Members; Capital; Capital Accounts

3.1. Initial Capital Contributions. Upon the execution of this Agreement, the Members shall contribute to the Company cash in the amounts respectively set forth on Exhibit A as initial contributions.

3.2. No Additional Capital Contributions Required.

3.2.1. No Member shall be required to contribute any additional capital to the Company, unless required by a vote of the Members holding two-thirds (2/3) in interest, and in no event in an amount greater than $2,000.00. No Member shall have any personal liability for any debt, obligation, or liability of the Company.

3.3. No Interest on Capital Contributions. Interest Holders shall not be paid interest on their Capital Contributions.

3.4. Return of Capital Contributions. Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive any return of any Capital Contribution.

3.5. Form of Return of Capital. If an Interest Holder is entitled to receive a return of a Capital Contribution, the Company may distribute cash, notes, property, or a combination thereof to the Interest Holder in return of the Capital Contribution at the discretion of the Board of Directors.

3.6. Capital Accounts. A separate Capital Account shall be maintained for each Interest Holder.

3.7. Loans. Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms as approved by a majority in interest of the other Members.

Article IV
Profit, Loss, and Distributions

4.1. Mandatory Distributions of Cash Flow. Cash Flow for each taxable year of the Company may, at the option of the Managing Member, be distributed to the Interest Holders in proportion to their Percentages within ninety (90) days after the end of the taxable year.

4.2. Allocation of Profit or Loss. After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss shall be allocated to the Interest Holders in proportion to their Percentages; provided however, that at the option of the Managing Member each Member may be repaid their respective investment in the Company, without interest, and thereafter net profits shall be split in proportion to each Members ownership as set forth in Exhibit "A" attached hereto and made part hereof.

4.3. Regulatory Allocations.

4.3.1. Qualified Income Offset. No Interest Holder shall be allocated Losses or deductions if the allocation causes the Interest Holder to have an Adjusted Capital Account Deficit. If an Interest Holder receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess

© 2005 NavAgility LLC.  All rights reserved.    NavAgility Confidential      Page 8 of 20

as quickly as possible. This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.3.2. Minimum Gain Chargeback. Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Article IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

4.3.3. Contributed Property and Book-Ups. In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.

4.4. Liquidation and Dissolution.

4.4.1. If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Section 4.2, if any, and distributions, if any, of cash or property pursuant to Section 4.1.

4.4.2. No Interest Holder shall be obligated to restore a Negative Capital Account.

4.5. General.

4.5.1. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Board of Directors.

4.5.2. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Members. The Profit or Loss for each unsold asset shall be

© 2005 NavAgility LLC.  All rights reserved.    NavAgility Confidential        Page 9 of 20

determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3. All Profit and Loss shall be allocated, and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to any extraordinary non-recurring items of the Company.

4.5.4. The Members are hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.

Article V
Management: Rights, Powers, and Duties

5.1. Management. The Company shall be managed by a Board of Directors to be appointed by Anthony M. DiMarco as the Managing Member consistent with the agreement of the parties.    Except as otherwise provided in this Agreement, no Member shall have the right to act for and bind the Company in the ordinary course of its business.

5.2. Meetings of and Voting by Members.

5.2.1. No annual or regular meetings of the Members as such shall be required.

5.2.2. A meeting of the Members may be called at any time by any Member. Meetings of Members shall be held at the Company's principal place of business or at any other place in Ulster County, New York designated by the Person calling the meeting. Not less than ten (10) nor more than sixty (60) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the place, date, hour, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy without objecting to the lack of notice. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than a majority (over 50 percent) of the Percentages then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney in fact.

5.2.3. Except as otherwise provided in this Agreement, the affirmative vote of Members holding a majority (over 50 percent) or more of the Percentages then held by Members shall be required to approve any matter coming before the Members.

5.2.4. In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding such Percentages then held by Members as would be required for Members to take action under this operating agreement. No written consent shall be effective to take such action unless within sixty (60) days of the earliest dated consent delivered in accordance with the Law, signed consents sufficient to take such action have been likewise delivered. If such consent is not unanimous, prompt notice shall be given to those Members who have not consented in writing but who would have been entitled to vote thereon had such action been taken at a meeting.

5.3. Personal Service. No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Members, no Member shall be entitled to compensation for services performed for the Company. However, upon substantiation of the amount and purpose thereof, the Members shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

5.4. Duties of Parties.

5.4.1. The Members shall devote such time to the business and affairs of the Company as is necessary to carry out the Members' duties set forth in this Agreement.

5.4.2. Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

5.4.3. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

5.5. Liability and Indemnification.

5.5.1. Except as otherwise provided by law, no Member shall be liable, responsible, or accountable in any way for damages or otherwise to the Company or to any of the Members for any act or failure to act pursuant to this Agreement or otherwise unless there is a judicial determination that (i) such person acted in bad faith, (ii) the conduct of such person constituted intentional misconduct or a knowing violation of law, (iii) such person gained a financial benefit to which he or she was not legally entitled, or (iv) such person failed to perform his or her duties, specifically with respect to

© 2005 NavAgility LLC. All rights reserved.    NavAgility Confidential        Page 11 of 20

distributions under section 508(a) of the Law, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

5.5.2. The Company shall indemnify, defend, and hold harmless each of the Members (severally, the "Indemnitee" and collectively, the "Indemnitees"), from and against any claims, losses, liabilities, damages, fines, penalties, costs, and expenses (including, without limitation, reasonable fees and disbursements of counsel and other professionals) arising out of or in connection with any act or failure to act by an Indemnitee pursuant to this Agreement, or the business and affairs of the Company to the fullest extent permitted by law; provided, however, that an Indemnitee shall not be entitled to indemnification hereunder if there is a judicial determination that] (a) such Indemnitee's actions or omissions to act were made in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) such Indemnitee personally gained a financial benefit to which the Indemnitee was not legally entitled.

Article VI
Transfer of Interests and Withdrawal of Members

6.1. Transfers.  Any Member may voluntarily Transfer all, or any portion of, or any interest or rights in, the Membership Interest owned by the Member.

6.2. Voluntary Withdrawal. No Member shall have the right or power to Voluntarily Withdraw from the Company, except as otherwise provided by this Agreement. Any withdrawal in violation of this Agreement shall entitle the Company to damages for breach, which may be offset against the amounts otherwise distributable to such member.

6.3. Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Withdrawn Member shall thereupon become an Interest Holder but shall not become a Member. If the Company is continued as provided in Section 7.1.3, the successor Interest Holder shall have all the rights of an Interest Holder (i.e., the right to receive the profits, losses, and distributions that the Member would have received, at the time the Member would otherwise have been entitled to receive them had the Member not withdrawn), but shall not be entitled by reason of the withdrawal to receive in liquidation of the Interest, the fair market value of the Member's Interest as of the date the Member Involuntarily withdrew from the Company.

Article VII
Dissolution, Liquidation, and Termination of the Company

7.1. Events of Dissolution. The Company shall be dissolved upon the happening of any of the following events:

7.1.1. when the period fixed for its duration in Section 2.4 has expired;

7.1.2. upon the unanimous written agreement of the Members or by the Board of Directors; or

7.1.3. the occurrence of an Involuntary Withdrawal, unless all of the remaining Members, within ninety (90) days after the occurrence of the

Involuntary Withdrawal, unanimously elect to continue the business of the Company pursuant to the terms of this Agreement.

   7.2. Procedure for Winding Up and Distribution. If the Company is dissolved, the remaining Members shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section 4.4 of this Agreement.

   7.3. Filing of Articles of Dissolution. If the Company is dissolved, the Board of Directors and Members shall promptly file Articles of Dissolution with the New York Department of State. If there are no remaining Members, the Articles shall be filed by the last Person to be a Member; if there are no remaining Members, or a Person who last was a Member, the Articles of Dissolution shall be filed by the legal or personal representatives of the Person who last was a Member.

Article VIII
Books, Records, Accounting, and Tax Elections

   8.1. Bank Accounts. All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Members shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

   8.2. Books and Records. The Members shall keep or cause to be kept complete and accurate books and records of the Company as required under Section 1102 of the Law as well as supporting documentation of transactions with respect to the conduct of the Company's business. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

   8.3. Annual Accounting Period. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Members, subject to the requirements and limitations of the Code.

   8.4. Reports. Within seventy-five (75) days after the end of each taxable year of the Company, the Members shall cause to be sent to each Person who was a Member at any time during the taxable year then ended an annual compilation report, prepared by the company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants. In addition, within seventy five (75) days after the end of each taxable year of the Company, the Members shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year. At the request of any Member holding twenty (20) percent or more of the Membership Interests, and at the Member's expense, the Members shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

© 2005 NavAgility LLC.  All rights reserved.     NavAgility Confidential

8.5. Tax Matters Member. The Members shall designate a Member to be the Company's tax matters partner pursuant to Code Section 6231(a)(7) ("Tax Matters Member"). The Tax Matters Member shall have all powers and responsibilities provided in Code Section 6221, et seq. The Tax Matters Member shall keep all Members informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Member. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Member in performing those duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Member shall not compromise any dispute with the Internal Revenue Service without the approval of the Members.

Article IX
General Provisions

9.1. Assurances. Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2. Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested or by facsimile transmission, provided receipt of facsimile transmission is actually acknowledged by the Member or Member's agent. A notice must be addressed to a Member at the Member's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees. A notice sent by facsimile is deemed given when receipt is acknowledged.

9.3. Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, the Company as well as any party who may be injured (in addition to any other remedies which may be available to the Company or that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4. Complete Agreement. Except for any attached Term Sheet(s), this Agreement constitutes the complete and exclusive statement of the agreement among the Members with respect to the subject matter thereof. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of the Members holding two-thirds (2/3) or more of the Percentages then held by Members.

9.5. Applicable Law. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of New York.

9.6. Article and Section Titles. The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7. Binding Provisions. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

9.8. [Non-]Exclusive Jurisdiction and Venue. Any suit involving any dispute or matter arising under this Agreement or relating to the organization or operation of the Company may [only] be brought in a United States District Court located in the State of New York or any New York State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding and waive any objection to venue or inconvenient forum.

9.9. Dispute Resolution.  In the event that any Member (or their successors, heirs, and permitted assigns) in their capacity as Members or as Managing Members are unable, for any reason, to agree regarding the performance of their duties and responsibilities hereunder or on any proposed sale or transfer of all or any portion of all or any membership interests (a "Deadlock"), then they jointly shall designate, by a writing (the "Mediator Appointment") signed by each of them, an individual (the "Mediator") to make such inquiry into the Deadlock as he or she, in his or her sold discretion, deems appropriate, and within seven (7) days after the date after the date of delivery of the Mediator.  Appointment of the Mediator shall present a written recommendation regarding the Deadlock to the Members (the "Recommendation"). The written determination of such individual shall be final, controlling, and binding upon the Member who promptly shall act in accordance with the written determination of such individual. In the event of any dispute concerning any valuation of any membership interest or portion thereof, for sale or otherwise, fair market value shall be applied. In the event that the Mediator fails or refuses to act as such, for any reason, then the Members jointly shall designate a replacement Mediator in the same manner by which the original Mediator was designated.  In the event that the Members are unable to agree on the identity of a Mediator, then either of them may initiate an arbitration proceeding within Ulster County, New York, purchase to the law of the State of New York (the "Arbitration") in order to resolve the Deadlock.  The Arbitration shall be conducted by and before a panel of three (3) arbitrators to be selected as follows:

The Member voting in favor of the Recommendation shall select one (1) arbitrator, and those two arbitrators together shall select a third arbitrator.  The arbitrators may adopt reasonable rules, consistent with New York law, for the conduct of the Arbitration.  The Limited Liability Company shall pay the fees and reasonable out of pocket expenses of the Mediator and the arbitrators, provided that no Mediator or arbitrators shall be paid a fee of more than $250.00 per hour. The arbitrators' decision shall be binding on the Members and the Limited Liability Company, and judgment may be entered thereon in any court having jurisdiction thereof.  The foregoing procedures are for the resolution of non-Emergency Deadlocks, shall be exclusive, and shall

constitute a bar to any and all other means of non-Emergency Deadlock resolution, including without limitation resort to court proceedings.  If a Deadlock pertains to circumstances in which a material interest of the Limited Liability Company may be jeopardized by immediate inaction (an "Emergency Deadlock"), then the Members retain whatever rights they each may have to seek appropriate emergency relief from a court of appropriate jurisdiction, and this paragraph of this agreement shall not constitute a bar to any such proceeding for emergency relief.

       9.10. Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

       9.11. Separability of Provisions. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement, which are valid.

       9.12. Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, as of the date set forth herein above.

MEMBERS:

_____          _____
Anthony M. DiMarco                        Thomas Azzarello


_____          _____
Richard C. Azzarello                      John R. Galanti


_____          _____
David L. Hawthorne

© 2005 NavAgility LLC.  All rights reserved.    NavAgility Confidential

**NavAgility LLC Operating Agreement**

**Exhibit A**

List of Members, Capital, and Percentages

Founders:

| Name | Address | Taxpayer ID (or Social Security #) | Percentage |
|------|---------|-----------------------------------|------------|
| Anthony M. DiMarco | 16 Nob Hill Road, Poughkeepsie, NY 12603 | 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 | 75.60% |
| Richard C. Azzarello | 299 8th Avenue, Sea Cliff, NY 11579 | 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 | 14.55% |
| David L. Hawthorne | 200 Mercer Street, New York, NY 10012 | | 4.85% |

Additional Investors:

| Name | Address | Taxpayer ID (or Social Security #) | Initial Cash Contribution | Percentage |
|------|---------|-----------------------------------|--------------------------|------------|
| Thomas Azzarello | 2037 Olympic Boulevard, Walnut Creek, CA 94595 | | $50,000 | 2.00% |
| John R. Galanti | 100 Corbett Road, Montgomery, NY 12549 | | $50,000 | 3.00% |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

© 2005 NavAgility LLC.  All rights reserved.    NavAgility Confidential

# NavAgility LLC Operating Agreement

## Attachment A – Term Sheet for John R. Galanti

Company:            NavAgility, LLC, a newly formed limited liability company
                    with a new operating agreement.

Investor:           John R. Galanti

Security:           a "member interest" in the newly formed Company LLC.

Use of Proceeds:    Operating funds for the Company, consistent with the to be
                    agreed upon budget.

Valuation:          The pre-investment valuation of the Company is $2,500,000.

Current
Investment:         The Investor, upon execution of the final agreement, shall
                    invest $50,000 in the Company.  The Investor shall
                    immediately receive a 2.0% ownership interest in the Company.
                    Such ownership shall be non-dilutive until the occurrence of
                    an equity event whereby the Company raises in excess of
                    $1,000,000 with a Company pre-money valuation of at least
                    $10,000,000.

Future
Investment:         The Investor shall have the right but not the obligation to
                    invest, an additional $50,000 in the Company, for up to six
                    months after the execution of the final agreement, receiving
                    a 2.0% ownership interest in the Company. This investment
                    shall carry the same terms and conditions as the Current
                    Investment, above.

Ownership Pool:     It is the intention of NavAgility to have each employee, and
                    approved external advisors, as part owners of the company.
                    An estimate of 15% ownership covering selected employees and
                    external advisors is assumed.  It is agreed that, for up to
                    six months from the execution of the final agreement, upon
                    the granting of any ownership right to an employee or
                    external advisor, the Investor ownership shall be non-
                    dilutive, and after six months from the execution of the
                    final agreement, each existing owner will dilute by the
                    percent of the ownership granted to the employee or external
                    advisor.  All such ownership rights granted shall be pre-
                    approved by the Board of Directors.

Advisory:           In recognition of the advice Investor provided/may provide to
                    the Company, upon the execution of the Agreement, the
                    Investor shall receive an "Advisory Inducement" equal to a 1%
                    member interest in the Company.  Such interest shall be non-
                    dilutive with the same terms and conditions as the Current
                    Investment.

Non-exclusivity:    The Company shall have the right to seek additional
                    investment from any third party, on valuation terms it deems
                    appropriate, provided that all the rights granted to the

© 2005 NavAgility LLC.  All rights reserved.    NavAgility Confidential

```
                    Investor, shall continued to be honored.

Governance:         The Investor shall have the right, but not the obligation, to
                    one Board seat upon the execution of the Agreement, for a
                    one-year term.
```

© 2005 NavAgility LLC.  All rights reserved.    NavAgility Confidential                Page 20 of 20